**DRISCOLL, Collector of Internal Revenue, v. WASHINGTON COUNTY FIRE INS. CO., WASHINGTON, PA.**

**No. 7221.**

Circuit Court of Appeals, Third Circuit.

Feb. 27, 1940.

Rehearing Denied April 2, 1940.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Carl J. Marold, Sp. Assts. to Atty. Gen., for appellant.

Wm. G. Heiner, of Pittsburgh, Pa., for appellee.

Before BIGGS, CLARK, and JONES, Circuit Judges.

BIGGS, Circuit Judge.

Upon December 8, 1873, the appellee, Washington County Fire Insurance Company, was incorporated pursuant to the provisions of Act No. 236,[1] p. 211, Laws of Pennsylvania, Session of 1856, in conjunction with the provisions of Act No. 27, p. 44, Laws of Pennsylvania, Session of 1867. The charter of the company (Section 2), issued by the Court of Common Pleas of Washington County, provided, "The business of the said Company shall be transacted upon the mutual principle, exclusively, and the said Company is allowed to insure on the cash or annual premium system, the sum so received to be paid into the common treasury of the Company, and in consideration thereof the said Company to be responsible for all losses occurring to property thus insured according to the terms of their policies. Insurance thus effected shall not entitle the insured to membership in said Company, nor subject them to the payment of assessments" Paragraph IX of the by-laws of the appellee provides: "Every person wishing to become a member of this Company, shall previous to being insured, deposit his application and premium note with the Secretary of said Company, and if approved, the policy shall bear date on that day, and take effect at noon, unless directed by the applicant to be dated on a future date. A sum equal to at least 5% of the premium note shall be paid at the time of making the application."

It appears from the agreed statement of facts that beginning in 1873, when the appellee was incorporated, all insurance policies were issued by it in consideration of a cash premium and a contingent liability represented by a deposit note. This course was continued until July, 1911, when the by-laws were amended to provide that an insured should execute a deposit note only when the property insured was not rated. Beginning in January, 1914 and until the present time (with the exception set forth in the next paragraph) insurance has been issued upon rated property and unrated property alike for an annual cash premium payable in advance without the execution of deposit notes.

The exception referred to is as follows. During the period involved in this litigation (1928 to 1936, inclusive) the sixteen persons who were or are in charge of the management of the company did execute deposit notes in accordance with the practice which prevailed prior to 1911. During this period the average number of policyholders was 3,000. The agreed statement of facts (Paragraph 12) states, "Only those persons executing deposit notes are members. The use of the deposit notes has been continued since 1914 for the purpose of providing for the membership entitled to elect the managing officers of the corporation. The personnel of the deposit note makers since 1914 has been determined by the directors of the plaintiff company. Every deposit note maker is a policyholder." No refunds or returns whether by way of the payment of redundancy or otherwise have ever been made to anyone. The corporation has prospered and no assessments have ever been made.

If the charter provisions alone constitute the contract between the appellee and its members, putting to one side for the time being the provisions of the Act under which the appellee was incorporated, only deposit note makers are members. It is clear that throughout the taxable period only the sixteen deposit note makers voted to elect directors, thereby fulfilling one of the functions of membership in a mutual association. All the other policyholders performed none of the duties of members. If the provisions of Section 2 of the charter are to be deemed valid they are not subject to assessment for losses, and policies of insurance were issued to them precisely similar to those issued by stock companies to those whom they insured. These policyholders, as distinguished from the deposit note makers, merely paid a fixed premium for which they obtained a contract of insurance.

The question presented for our determination is whether the appellee was exempt from the payment of income taxes during the years 1928 to 1936 inclusive. The Federal Acts[2] provide:

---

[1] This Act was repealed by 1921 P.L. 682, Art. XI, Sec. 1101, 40 P.S.Pa. § 991.

[2] Revenue Act of 1928, c. 852, 45 Stat. 791, 812, 813, Sec. 103 (11); Revenue Act of 1932, c. 209, 47 Stat. 169, 193, Sec. 103 (11); Revenue Act of 1934, c. 277, 48 Stat. 680, 700, 701, Sec. 101 (11); and Revenue Act of 1936, c. 690, 49 Stat. 1648, 1673, 1674, Sec. 101 (11),

"The following organizations shall be exempt from taxation under this title [chapter]—

\* \* \*

"(11) Farmers' or · other mutual hail, cyclone, casualty, or fire insurance companies or associations \* \* \* the income of which is used or held for the purpose of paying losses or expenses."

Was the appellee a mutual company? The court below held that it was, believing that its membership could not be limited to the deposit-note makers despite the provision of the charter 'to such effect. The argument in favor of this conclusion may be stated as follows. Section 11 of the Pennsylvania Act of 1856[3] provides that membership in the company may be obtained by payment of a premium or contracting to pay it and that the extent of the liability of the insured for assessment should be limited to the amount of such premium. Therefore by the payment of a premium, the insured becomes a member of a mutual company, but is not liable for assessment beyond the amount of the premium paid. The Supreme Court of Pennsylvania has construed the Act of 1856 to such effect in the case of Schimpf & Son v. Lehigh Valley Mutual Insurance Co., 86 Pa. 373, 376. The terms of a statute under which a corporation is created may be read into and become a part of the contract between the corporation and its members. Therefore, runs the argument, all policyholders are members of the corporation. All policyholders, whether they have given deposit-notes or not, possess the right to vote for directors for such a right is given to policyholders by Section 11[4] of the Act of 1856. The policyholders are the only persons interested in the appellee and they are all treated upon an identical basis. Therefore, says the appellee, it is a mutual company.

The exempting statutes, however, require that the appellee meet a two-fold test if it is to gain exemption. Not only must it be a mutual company but its income must be used or held solely for the payment of losses or expenses. MacLaughlin v. Philadelphia Contributionship, 3 Cir., 73 F.2d 582; Baltimore Equitable Society v. United States, Ct.Cl., 3 F.Supp. 427, certiorari denied 290 U.S. 662, 54 S.Ct. 77, 78 L.Ed. 573. The appellee contends that it meets the second requirement as well as the first, that not only is it a mutual company but all of its income is held for the purpose of paying losses and expenses. The District Court so held. Assuming arguendo, that the appellee must be deemed to be a mutual company within the purview of the statutes conferring exemption, let us test first the last contention of the appellee.

It is clear that the income upon which the appellee was taxed in the taxable years in question was net income computed after deducting payments for losses and expenses. The income taxed was not used for the payment of losses or expenses. Was it held for such purposes? It will be observed that the company's surplus increased from $280,000 in 1929 to $446,000 in 1936. Throughout the taxable years in question the appellee has had insurance in force averaging more than $10,000,-000. The amount of surplus is far in excess of unearned premium reserve required

---

U.S.C., Title 26, Sec. 103 (11), 26 U.S.C.A. Int.Rev.Code, § 101 (11).

The pertinent provisions of the respective Acts are identical. ·

[3] Section 11 of the Act of 1856 provides in part: "That whenever any company may be incorporated under this law, and may intend to transact its business upon the mutual principle exclusively, or in connection with a joint stock capital, it shall be so designated in its charter; and if upon the mutual principle exclusively, then the parties named in said special act, and their associates, shall be made and constituted a body corporate, directly, and without the grant of letters patent, as hereinbefore provided in reference to joint stock companies; and in that case all persons insuring with, and continuing to be insured therein, shall thereby become members during the period they shall remain so insured, and no longer, and shall pay such rates as shall be determined by the board of directors, and be liable for all losses and expenses of said company, to the amount of the premiums paid, or agreed to be paid by said members respectively."

[4] The pertinent language of Section 11 of the Act of 1856 is as follows:

"At the elections for directors, each member insured by any sum not less than one dollar, paid in as a premium of insurance to said company during the year previous to said election, and on policy then existing, shall have one vote; and for every additional twenty-five dollars so

by the law of Pennsylvania.[5] These facts require a further consideration of the terms of the Act of 1856.

The Act of 1856 was a general incorporation act for insurance companies. It provided for the incorporation of joint stock insurance companies, for mutual companies, and for hybrid companies authorized to issue insurance both as joint stock companies and upon the mutual principle at the same time. It prescribed the terms upon which such companies might do business. Section 12 of the Act provides for the payment of dividends by joint stock companies, and in respect to companies "* * * organized upon the mutual principle exclusively, [the Section states that] each member shall be entitled to such a proportion of the said surplus, as the cash premium paid by such members respectively may bear to the aggregate surplus so declared; and for the proportionate share of each member so ascertained, a certificate shall be issued, declaring him or them to be entitled to such a portion of the accumulated capital of the company; said certificate to be construed and governed as hereinafter mentioned; but no certificate shall be issued for a less sum than twenty-five dollars, nor for any fractional part of five dollars, and shall, at the discretion of the directors bear, and be paid interest at a rate not exceeding six per centum per annum."

Section 14 of the Act provides: "That within thirty days after the yearly balance of the affairs of said company shall be struck, the directors shall cause to be paid, in cash, to the stockholders of any such joint stock insurance company, the amount of dividends they may respectively be entitled to; and where any such company may be chartered upon the stock and mutual principle combined, they shall cause to be paid to the stockholders, in cash, not exceeding six per centum on their stock respectively; and shall issue the company's certificates to such insured members and stockholders respectively, agreeably to the provisions of the twelfth section; in which case, and where said company shall be chartered on the mutual principle exclusively, the certificates issued to the members as aforesaid shall not be paid until the net profits or surplus shall exceed the sum of two hundred and fifty thousand dollars, when the said excess may be applied for the redemption of the said certificates, and any arrears of interest that may have been allowed thereon."

■■ The law pursuant to which appellee was incorporated thus declares that each member is entitled to an aliquot share of the appellee's surplus and the directors are required to issue to them certificates to such effect. The payment of interest upon the certificates is discretionary as is the ultimate payment of the shares represented by the certificates subject to the qualification that the surplus of the company must exceed $250,000 before that discretion may be exercised. As noted, the surplus of the appellee far exceeds this sum and has done so throughout the whole of the taxable period. We think that the discretion of the directors of mutual fire insurance companies incorporated under the Act of 1856 is a legal discretion and may not be abused. White v. Provident L. & Tr. Co., 237 Pa. 375, 384, 85 A. 463; Grange v. Penn Mutual Life Insurance Co., 235 Pa. 320, 329, 330, 84 A. 392; In re Fraternal Guardians Assigned Estate, Sheeler's Ap., 159 Pa. 594, 28 A. 482. See, also, McKean v. Biddle et al., 181 Pa. 361, 37 A. 528. If the financial condition and surplus of a mutual fire insurance company incorporated under the Act of 1856 are such as those of the appellee and interest bearing certificates representing redundancy have not been issued, we entertain no doubt that directors may not be heard to say that the surplus is not held for the benefit of the members.

■ How such a distribution of surplus including earnings could be made is not the question before us. We are concerned with a question of taxation and not with corporate management, but it does appear from the record that the appellee has invested profitably its accumulated capital from time to time and received income from such investments throughout the taxable period. Payments of redundancy must be treated as elements of expense deductible from gross income for income tax purposes (see paragraph (c) (3) of Section 208 of the Revenue Act of 1928, c. 852, Sec. 208, 45 Stat. 846, 26 U.S.C.A. Int.Rev. Code, § 207 (c) (3), but payments of corporate earnings to members of a company are not so deductible. It follows that sur-

---

paid, one other vote. In other respects, the management of said mutual companies shall be as hereinbefore provided in

reference to joint stock insurance companies: * * *".

[5] 40 P.S.Pa. §·91.

plus held even in part for the payment of interest upon redundancy certificates is not held for the payment of losses and expenses, treating expenses as including redundancy. For analogy see MacLaughlin v. Philadelphia Contributionship, supra, 73 F.2d at page 584.

The appellee contends, however, that following the passage of the Act of May 25, 1921, P.L. 1124, 40 P.S. Pa. § 677, by the Legislature of Pennsylvania it could not hold its surplus for any other purposes than the payment of losses and expenses. Section 3 of the Act of May 25, 1921 provides that: "That surplus of any domestic fire insurance companies issuing policies in accordance with the provisions of section one or two of this act shall be held as a reserve for the payment of losses and expenses; and, in the event of dissolution of the company, shall be divided pro rata among the policyholders whose policies are in force at the time of dissolution, but no policyholder, other than loss claimants, shall receive more than the amount of the unearned cash premium last paid to the company for the current term of such policy. Any balance remaining shall escheat to the Commonwealth of Pennsylvania." Section 2 of the Act, 40 P.S.Pa. § 676, need not be discussed here. Section 1, 40 P.S.Pa. § 675, however, provides that: "Any domestic mutual fire insurance company, organized prior to May first, one thousand eight hundred and seventy-six, having a surplus not less than the minimum capital required for the organization of a domestic stock fire insurance company and an unearned premium reserve computed upon the same basis as that required of domestic stock fire insurance companies, may issue policies for a cash premium without any contingent liability for assessment." The appellee's accumulated capital and unearned premium reserve is sufficient to meet the requirements of this section if it be applicable. We think that the Amendment of 1857 to the Constitution of Pennsylvania of 1838, providing that the Legislature shall have the power to alter the provisions of any charter thereafter conferred by general or special law, is applicable to the charter of the appellee. It follows, says the appellee, that the Legislature by passing the Act of May 25, 1921 has amended its charter and has set forth in the Act itself the purposes for which the appellee must hold its surplus if it operates upon the basis set forth in Section 1. The provisions of Section 3 of the 1921 Act may be held to constitute a valid exercise of police power by the Commonwealth.[6] It is not necessary for us to pass upon this question, however, for it is our opinion that the appellee is not a mutual company.

■ The essential of mutuality is membership. In Cooley's Briefs on Insurance, 2d Ed., 1927, vol. 1, p. 68 it is stated that "* * * the fundamental principle of a mutual insurance company is that the company in no case can insure property not owned by one of its members." See Penn Mutual Life Ins. Co. v. Lederer, 252 U.S. 523, 533, 534, 40 S.Ct. 397, 64 L.Ed. 698; Atlantic Life Insurance Co. v. Moncure, D. C., 35 F.2d 360, 362; Hays v. Lycoming Fire Insurance Co., 98 Pa. 184, 191; Given v. Rettew, 162 Pa. 638, 640-641, 29 A. 703; McKean v. Biddle, supra, 181 Pa. at page 362, 37 A. 528. Incident to membership is the right to redundancy and the burden of assessment. As was stated by the Supreme Court in Penn Mutual Life Ins. Company v. Lederer, supra, 252 U.S. 525, 40 S.Ct. 397, 64 L.Ed. 698, it is the essence of mutual insurance that the excess in the premium over the actual cost as ascertained shall be returned to the policyholders.

Without regard to the purposes for which the appellee holds its surplus, it is the case that by the terms of its own charter, by the conditions of its own by-laws and by the very stipulation of the agreed statement of facts, those policyholders who have not executed deposit-notes are not members. The appellee cannot refuse membership to those whose property it insures for a cash premium and grant it to those whose property it insures for the consideration of a deposit-note and be deemed to be a mutual company. Even if those whose property is insured solely for a cash premium be deemed to be members as well as the deposit-note makers, those members are treated upon different bases, for each class receives insurance under different conditions. From either viewpoint, the appellee carried on a non-mutual business.

■■ Looking to the actual conduct of the appellee from the time of its incorpor-

---

[6] So far as we can ascertain, the validity of Section 3 of the Act of May 25, 1921 has been passed upon but once; namely, by the court below in the case at bar.

ation through the period embraced by this suit, we find the following. From the time of its incorporation in 1873 to 1911, the appellee operated on a strictly mutual basis, all policyholders making deposit-notes and delivering them to the appellee, thereby becoming members of the corporation. From 1911 until the end of the taxable period the appellee did not operate as a mutual company or upon a mutual basis. Specifically, throughout the taxable period deposit-notes have been given by less than 1% of the persons to whom policies have been issued. It therefore conducted its business upon a dual basis with membership for the sixteen deposit note-makers and non-membership for the other three thousand or more policyholders. Even treating all those whose property was insured as members, the status of the two groups was essentially different and such as to destroy mutuality. The note-makers voted for directors and managed the company; the non note-makers did not do these things. We think it is fruitless to argue that perhaps the non note-makers could have gone into a court of equity and compelled the appellee to recognize them as members. The determination of that question involves the internal management of a Pennsylvania corporation and is one which would have to be determined by the courts of that state. Our problem is the determination of the applicability of Federal Exempting Acts. In determining such applicability we must look not to what the appellee should have done or what it could have been compelled to do by premium-paying policyholders in search of membership status. Upon the contrary, we must find what it actually did do and judge it accordingly. In Bowers v. Lawyers' Mortgage Co., 285 U.S. 182, 188, 52 S.Ct. 350, 353, 76 L.Ed. 690, the Supreme Court in holding that a company incorporated, inter alia to do business as an insurance company, was not taxable as such, the Supreme Court by Mr. Justice Butler stated: "While name, charter powers, and subjection to state insurance laws have significance as to the business which a corporation is authorized and intends to carry on, the character of the business actually done in the tax years determines whether it was taxable as an insurance company." So in the case at bar, what the appellee actually did in the taxable years determines whether it is entitled to exemption as a mutual insurance company. We conclude for the reasons stated that the appellee is not entitled to exemption.

The judgment of the court below is reversed and the cause is remanded with directions to enter judgment for the appellant.