## MUTUAL FIRE INS. CO. OF GERMANTOWN v. UNITED STATES.
### Nos. 1478, 2503.

District Court, E. D. Pennsylvania.

June 2, 1943.

---

[12] Rule VIII, I. C. C. Rules and Regulations effective November 16, 1936, p. 5.

Horace Michener Schell, of Philadelphia, Pa., (Montgomery, McCracken, Walker & Rhoads, of Philadelphia, Pa., of counsel), for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Paul R. Russell, Sp. Assts. to Atty. Gen., and Gerald A. Gleeson, U. S. Atty., and Thomas J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa., for the United States.

KALODNER, District Judge.

The plaintiff seeks recovery of an alleged overpayment of its federal income taxes for the calendar year 1938. Two separate actions by the plaintiff have been consolidated. The recovery sought in the original action (No. 1478) is $4,758.73 and interest. The recovery sought in the second action (No. 2503) is $10,214.17 and interest, and it embraces the amount of recovery sought in the first action.

The defendant filed a motion to dismiss action No. 1478, and since in my opinion the questions involved are adequately presented in the second action, No. 2503, the

motion to dismiss will be granted without prejudice.

It may be stated at this point that the alleged overpayments consist of plaintiff's original tax as disclosed by its return, amounting to $4,040.78, and a deficiency tax of $5,620.93, together with interest paid in the sum of $552.46.

Three issues are involved here:

(1) Did the plaintiff operate as an insurance company during the year 1938, within the meaning of the Revenue Act of 1938?

(2) If the plaintiff did operate as an insurance company, is it exempt from income tax for the year 1938 by virtue of the provisions of section 101(11) of the Revenue Act of 1938, 26 U.S.C.A.Int.Rev.Code, § 101(11), on the ground that it was a mutual fire insurance company, the income of which was used or held for the purposes of paying losses or expenses.

(3). If plaintiff is not exempt from income tax under the provisions of Section 101(11), is it entitled to a deduction of $51,-101.39 for the year 1938 under Section 207 (c) (3) of the Revenue Act of 1938, 26 U.S.C.A.Int.Rev.Code, § 207(c) (3), on the ground that this sum—representing premiums earned during the entire calendar year —was retained for the payment of losses, expenses and re-insurance reserves [1]?

The Commissioner rejected all of the claims of the taxpayer for refund, resulting in the institution of the instant suit.

A jury trial was waived, and the case was submitted to the court upon the pleadings, stipulation of facts, and additional testimony.

## Findings of Fact

The stipulated statement of facts, which is hereby adopted as the findings of fact of this court, in part, is as follows:

1. Plaintiff is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with its principal office and place of business located at 5521 Germantown Avenue, Philadelphia, Pennsylvania. The plaintiff secured its original charter of incorporation by Special Acts of the General Assembly of the Commonwealth of Pennsylvania approved the 15th day of April, 1843, P.L. 266, and the 10th day of February, 1859, P.L. 45, as supplemented by a Special Act approved the 28th day of March, 1872, P.L. 608, a copy of said Act as amended and supplemented, together with the by-laws promulgated thereunder are attached hereto and made a part hereof, and marked Exhibit 1. It has, since the earliest date herein mentioned, up to and including the present time, been continuously engaged in business as a fire insurance company.

2. From the 15th day of April, 1843, to and including the 7th day of June, 1938, plaintiff continued to carry on its business under the charter originally granted to it by Special Act of the Commonwealth.

3. The plaintiff, as of May 25, 1938, at a special meeting of its policy holders called for said purpose, formally voted to accept the provisions of the Insurance Code of the Commonwealth of Pennsylvania. Such action was thereafter, on June 1, 1938, approved by the Attorney General's office and by the Governor's office, and on June 2, 1938, by the Secretary's office, all of which appears more fully in the "Certificate of Amendment of Charter by the Mutual Fire Insurance Company of Germantown and its Vicinity", together with related documents thereto attached, a copy of which is attached hereto and made a part hereof, and marked Exhibit 2. The company has operated as an insurance company from June 8, 1938, until the present time under the provisions of the charter as changed on June 8, 1938, as aforesaid.

4. The plaintiff adopted by-laws, effective June 8, 1938 pursuant to its revised charter. A copy of the by-laws is hereto attached and made a part hereof, and marked Exhibit 3.

5. On March 13, 1939, the plaintiff filed its income tax return for the calendar year 1938 on Form 1120 as a mutual insurance company, showing gross income of $159,-664.14, deductions of $130,245.15, and a net taxable income of $25,884.52, upon which a tax was paid of $4,040.78 in four installments on the following dates respectively: $1,010.20 on March 13, 1939; $1,010.20 on June 10, 1939; $1,010.20 on September 13, 1939; $1,010.18 on December 8, 1939.

A true copy of the income tax return of the plaintiff for the calendar year 1938 is attached hereto and made a part hereof, and marked Exhibit 4.

[1] Plaintiff also contends that if it is not entitled to such a deduction for the full year of 1938, it is entitled to a deduction of $28,840.78 for the period from June 8 to December 31, inclusive, 1938.

6. In said return the plaintiff reported premiums earned of $51,101.39, and deducted the sum of $28,840.78 alleged to have been retained for the payment of losses and expenses. The latter figure represented 206/365ths of the total premiums earned during the calendar year, there being 206 days from June 8, 1938, to the end of the year.

7. By letter dated March 18, 1940, from the Internal Revenue Agent in Charge at Philadelphia, Pennsylvania, addressed to plaintiff, a deficiency in tax was proposed for the year 1938 in the amount of $5,620.-93. This proposed deficiency arose in part from the disallowance of the deduction claimed by plaintiff of $28,840.78. The Commissioner of Internal Revenue approved the deficiency proposed by the Agent in Charge and assessed the same against the plaintiff in November, 1940. The following grounds were assigned for such disallowance: "It would appear that the taxpayer is mutual in form only. The amendments to the Charter and acceptance of the provisions of the Insurance Code of 1921, which were accomplished in the year under review, are not considered sufficient changes to bring the taxpayer under Section 207(c) (3) of the Act, since no change was effected in the taxpayer's actual operations."

On November 4, 1940, the plaintiff paid the additional tax in the amount of $5,620.-93, together with interest in the amount of $552.46, to the Collector of Internal Revenue at Philadelphia, Pennsylvania.

8. On November 15, 1940, and December 3, 1940, plaintiff filed duplicate claims for refund in the amount of $4,758.73, representing the amount of tax due on the disallowance of $28,840.78 claimed as a deduction for premiums retained, and set forth as grounds for its claim that the deduction of $28,840.78 was allowable to plaintiff as a mutual insurance company, other than life and marine, under the provisions of Section 207(c) (3) of the Revenue Act of 1938. A copy of the claim filed on November 15, 1940, is attached hereto and made a part hereof, and marked Exhibit 5.

9. By letter dated March 27, 1941, the Commissioner of Internal Revenue notified the plaintiff that said claim for refund had been disallowed in full. A true and correct copy of said letter is attached hereto and made a part hereof, and marked Exhibit 6.

10. On December 6, 1941, and February 6, 1942, the plaintiff filed further duplicate claims for refund of tax for the year 1938 in the amount of $9,661.71, together with interest paid thereon in the amount of $552.46, or a total of $10,214.17. The grounds for refund as set forth in said claims for refund were (a) that the plaintiff under and by virtue of Section 101(11) was a corporation wholly exempt from the payment of tax upon its net income, and (b) that if it was not exempt from income tax under Section 101(11) of the Revenue Act of 1938, then it was a mutual insurance company of the character described in Section 207(c) (3) of the Revenue Act of 1938, and as such it was entitled to a deduction of $51,101.39, being the amount of premium deposits alleged to have been retained by the plaintiff during the entire year 1938 for the payment of losses, expenses and reinsurance reserves. A true copy of the claim filed on December 6, 1941, is attached hereto and made a part hereof, and marked Exhibit 7.

11. By letter dated March 30, 1942, the Commissioner of Internal Revenue notified the plaintiff that said claim for refund had been disallowed in full. A true and correct copy of said letter is attached hereto and made a part hereof, and marked Exhibit 8.

12. The plaintiff has at no time made any assessments against or distributions to its policyholders by way of dividends or otherwise except that during the year 1873 scrip, payable in insurance, was issued to policyholders in the amount of $36,377.43.

13. During the year 1938 plaintiff issued contracts of insurance of three separate kinds, as follows:

1. Term policies.

2. Perpetual policies.

3. Perpetual policies on the note plan.

4. Extended coverage clauses added as endorsements to the policies.

True copies of said policies are attached hereto and made a part hereof, and marked Exhibits 9, 10, and 11 respectively.

14. The plaintiff filed annual statements with the Insurance Commissioner of the Commonwealth of Pennsylvania summarizing its business operations for each calendar year. True copies of certain portions thereof, including schedules of income, disbursements, assets, liabilities, contingency fund and underwriting and investment exhibits, for the years ended De-

cember 31, 1932, to December 31, 1938, inclusive, are attached hereto and made a part hereof, and marked Exhibits 12, 13, 14, 15, 16, 17 and 18.

In addition to the stipulated facts the court makes the following

### Special Findings of Fact

1. Although plaintiff was engaged in the business of insuring against losses by fire, the greater part of its income during the period beginning January 1, 1934, and ending December 31, 1938, was from investments, consisting principally of interest and rentals. For 1938 the investment gross income as computed by its account amounted to $155,300.81, or 71 per cent, and the underwriting gross income, including investment income in the amount of 5 per cent of perpetual insurance deposits (included under the regulations of the Pennsylvania Insurance Commissioner), amounted to only $62,661.53, or 29 per cent.

2. Section 3 of the original charter provided "That each insurer in or with said Company shall be a member thereof during the term of his or her policy and no longer". Plaintiff's by-laws under its amended charter contained the same provision.

3. Section 3 of a bill duly enacted by the Commonwealth of Pennsylvania in 1859 provided "That the profits, after deducting the necessary expenses of the Association, shall be held as a contingent fund and all dividends may be settled for by the issue of scrip, which scrip may be received in payment of interest on premium notes, and in payment of premiums for new insurances".

4. Effective June 8, 1938, plaintiff's charter was amended, the amended charter providing that the company's business was to be conducted on the mutual plan or principle. However, plaintiff continued to conduct its business after June 8, 1938, in the same manner as theretofore, the sole change being that a different kind of insurance could be and was written as a supplement to the fire insurance contracts, covering losses from windstorm, cyclone, tornado, hail, etc.

5. Plaintiff issues cash perpetual policies, note premium perpetual policies, and term insurance policies, at rates promulgated by the Insurance Underwriters Association for stock fire insurance companies operating in the Philadelphia area. The policies issued during 1938 had the word "non-assessable" either printed or stamped thereon. Since June 8, 1938, plaintiff has also issued extended coverage contracts covering losses by windstorm, cyclone, tornado, hail, etc.

6. Due to lapses of policies and to the issuance of new insurance contracts, plaintiff's membership changed from year to year. Under the charter and by-laws, members who dropped out of the company lost all claim to or interest in accumulated surplus of the corporation.

7. Plaintiff issued no capital stock, its net worth as shown in its annual statements being reflected in a contingent fund which on December 31, 1938, amounted to $3,186,656.37. The annual increases in the company's surplus resulting from earnings were carried to this contingent fund. The amount of the general reserve required under the Pennsylvania law during the year 1938 was $250,000. This reserve fund was included in the contingent fund of $3,186,656.37.

8. Aside from the fact the policy holders were entitled to elect the management of the plaintiff corporation, it conducted its business in a manner comparable to stock fire insurance companies, charged the same rates, and paid the same brokers' commissions. Of approximately 17,000 members, only two to three hundred actually attended plaintiff's annual meetings. Like the stock fire insurance companies, plaintiff belonged to the Middle Department of fire insurance underwriters, which fixed standard rates for its members. Mutual companies which issued policies at reduced rates or gave rebates were not admitted to membership in this organization.

9. The evidence fails to establish that plaintiff retained the sum of $51,101.39 representing the premiums earned during the year, or any part thereof, solely for the payment of losses, expenses and reinsurance reserves. The losses and expenses of plaintiff's insurance business as compiled by the company for 1938 were in excess of the underwriting income. All such losses and expenses were taken as deductions from plaintiff's income in its federal income tax returns.

10. From the 15th day of April, 1843, to and including the 7th day of June, 1938, the plaintiff continued to carry on its business under the charter originally granted to it by Special Act of the Commonwealth. Thereafter, to wit, on the 8th day of June, 1938, it accepted the provisions

of the Act of May 17, 1921, P.L. 682, as amended by the Act of April 26, 1929, P.L. 782, and the Act of April 26, 1929, P.L. 784, known as the Insurance Code 40 P.S. Pa. §§ 341 et seq., and was granted a revised charter under which it continued to operate as an insurance company until the present date.

11. The action of the plaintiff in securing such revised charter was taken pursuant to Article I, Section 104, of the Insurance Code, 40 P.S.Pa. § 364, which provides in part as follows: "* * * Any domestic mutual fire company or association may elect to adopt and become subject to the. provisions of this act, in lieu of any act or acts heretofore governing such company or association, by resolution of its board of directors, duly approved by a majority of the members present at any annual meeting or special meeting called for that purpose, of which all members shall be given at least two weeks notice by mail. These resolutions, and the vote approving them, duly certified to by the president and secretary, shall be filed with the Insurance Commissioner, and, when approved by him, the company shall then and thereafter become subject to the provisions of this act."

12. The amendment to plaintiff's charter, approved by the General Assembly as of March 28, 1872, contained in part the following provisions:

"Section 2. That it shall be lawful for said Company to employ and improve all moneys received by them, and the profits thereof, in the purchase of any groundrents or mortgages, or in any loans or stocks of the United States, or of this Commonwealth, or in any other good securities.

"Section 3. That the profits, after deducting the necessary expenses of the Association, shall be held as a contingent fund, and all dividends may be settled for by the issue of scrip, which scrip may be received in payment of interest on premium notes, and in payment of premiums for new insurances."

13. The Act of May 17, 1921, P.L. 682, Section 201, 40 P.S.Pa. § 381, provides specifically for a classification of insurance companies, and subdivision (e) refers to "Mutual Insurance Companies of any kind other than mutual life insurance companies." Section 806 of said Act, 40 P.S. Pa. § 916, specifically provides that such insurance companies may issue policies for a cash premium. Section 807 of said Act, 40 P.S.Pa. § 917, requires mutual insurance companies to maintain unearned premium and other reserves separately.

14. The Act of May 25, 1921, P.L. 1124, Section 1, 40 P.S.Pa. § 675, provides that any domestic mutual fire insurance company organized prior to May 1, 1876, and having a surplus of not less than the minimum required of a domestic stock fire insurance company, and unearned premium reserve computed on the same basis, may issue policies for a cash premium without contingent liability for assessment. Section 3 of said Act of May 25, 1921, P.L. 1124, 40 P.S.Pa. § 677, provides as follows: "The surplus of any domestic mutual fire insurance companies issuing policies in accordance with the provisions of section one or two of this act, shall be held as a reserve for the payment of losses and expenses; and, in the event of dissolution of the company, shall be divided pro rata among the policy holders whose policies are in force at the time of dissolution, but no policy holder, other than loss claimants, shall receive more than the amount of the unearned cash premium last paid to the company for the current term of such policy. Any balance remaining shall escheat to the Commonwealth of Pennsylvania."

15. That the operation of the business of the company is vested solely in its members.

16. From the date of the original incorporation of the company to and including the end of the taxable year in question, the plaintiff has written no insurance in counties other than Philadelphia, Bucks and Montgomery, and that better than ninety per cent of such insurance is confined to the City and County of Philadelphia.

17. As of the close of the calendar year 1938, the plaintiff had risks in force written under term insurance policies of approximately $41,873,435.17, and that as of the same time it had risks in force on policies written under perpetual policies of approximately $8,431,420.81.

18. Against these total risks in force of approximately $50,304,855.98, the plaintiff maintained, as of December 31, 1938, a contingency fund of approximately $3,156,049.07.

19. Plaintiff is a member of the Middle Department Rating Bureau, which is a bu-

reau created and maintained for the purpose of fixing and determining rates upon various classes of risk. That the membership of plaintiff with the Middle Department Rating Bureau is for the purpose of obtaining rates for the various types of risk which it has been requested to insure. The plaintiff is not a member of the National Board of Fire Underwriters.

## Discussion

Briefly stated, the principal issues here involved are (1) whether the plaintiff operated as an insurance company during the tax year under review, and (2) was it a mutual company within the meaning of Section 101(11) of the Revenue Act of 1938.

As to the first question—did the plaintiff operate as an insurance company:

The defendant's contention that the plaintiff was not an insurance company within the meaning of the revenue laws is based primarily on the fact that the bulk of its operating income for the year 1938 results from investment as distinguished from underwriting income. The defendant relies on several decisions dealing with mortgage guarantee and title companies to sustain its claim that the plaintiff is not entitled to be considered as an insurance company for income tax purposes.[1]

I am of the opinion that the cases cited by the defendant relating to mortgage guarantee and title companies do not apply to a company such as is operated by the plaintiff, which has regularly conducted an insurance business for many years under charter powers which confine its business strictly to an insurance business. The fact that over a period of years the plaintiff has accumulated a substantial reserve in the operation of its insurance business, which it has invested and which brings relatively large returns in income as compared with underwriting income, does not in my opinion change the fundamental character of the plaintiff's operations as an insurance company.[2] I therefore conclude that plaintiff operated as an insurance company.

As to the second question—did the plaintiff operate as a mutual company so as to be exempt from taxation under the provisions of Section 101(11) of the Revenue Act of 1938, c. 289, 52 Stat. 447:

Section 101 provides as follows:

"§ 101. Exemptions from tax on corporations. The following organizations shall be exempt from taxation under this title—
*    *    *    *    *

"(11) Farmers' or other mutual hail, cyclone, casualty, or fire insurance companies or associations (including interinsurers and reciprocal underwriters) the income of which is used or held for the purpose of paying losses or expenses."

Treasury Regulations 101, promulgated under the Revenue Act of 1938, provides as follows:

"Art. 101(11)-1. Farmers' or other mutual hail, cyclone, casualty, or fire insurance companies or associations.—To be exempt under Section 101(11) the business of the organization must be purely mutual and its income must be used or held solely for the purpose of paying losses or expenses. Neither the extent of the territory in which the company may properly operate nor the fact that it accepts premium deposits instead of assessments is decisive as to its exemption. The writing of non-mutual insurance regardless of amount will deprive a company of the exemption."

The defendant's contention that the plaintiff is not a mutual company is premised on the grounds that it was not operated upon a mutual plan or principle; that it issued non-assessable policies and paid no rebates, like stock companies; that the income of the plaintiff, other than that used for the payment of losses or expenses for which appropriate deductions had already been taken, was not held for payment of losses or expenses; and that the surplus revenues not used for payment of losses or expenses were added to surplus carried in an account called "Contingent Fund".

The plaintiff contends, on the other hand, that it is a fire insurance company,

[1] Bowers v. Lawyers' Mortgage Co., 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690; Empire Title & Guarantee Co. v. United States, 2 Cir., 101 F.2d 69; Lincoln Mortgage & Title Guaranty Co. v. Commissioner, 3 Cir., 79 F.2d 585, certiorari denied 296 U.S. 654, 56 S.Ct. 381, 80 L.Ed. 466; National Commercial Title & Mortgage Guaranty Co. v. Duffy et al., 3 Cir., 132 F.2d 86, decided December 4, 1942.

[2] Baltimore Equitable Society v. United States, 1933, 3 F.Supp. 427, 77 Ct.Cl. 566.

operating and organized on a purely mutual basis, and that as such it comes within the purview of both Section 101(11) and Section 207 of the Revenue Act of 1938. Urging that neither Section 101(11) nor Section 207 defines what a mutual insurance company shall be for federal income tax purposes, the plaintiff asserts that reliance must be placed on the local definitions for the characteristics which distinguish mutual insurance companies from stock companies; and further that if, under a State law and under the generally accepted definitions, a company qualifies as a mutual company, it comes within the meaning of Section 101(11) and Section 207.

■ It is well settled that statutes granting exemptions from income taxes are strictly construed and that the burden rests upon the taxpayer to show that it comes within the exemption. MacLaughlin v. Philadelphia Contributionship, etc., 3 Cir., 73 F.2d 582.

■ Plaintiff places great weight upon the fact that on June 8, 1938, there was a change in its charter whereby it became a "mutual" company under the Pennsylvania Act of May 25, 1921, P.L. 1124, Sec. 1. The provisions of that Act are set forth in special findings of fact No. 14. However, the provisions of a State law cannot alter the essential characteristics required to enable a so-called "mutual" insurance company to obtain exemption under the provisions of Section 101(11).

■ In the instant case, it is clear that the plaintiff does not operate as a *purely* mutual company as contemplated by Section 101(11). It is well settled that the primary and fundamental characteristic of a mutual insurance company is its organization and operation exclusively for the purpose of furnishing insurance at cost to its policy holders.

The United States Circuit Court of Appeals for this Circuit, in Driscoll v. Washington County Fire Ins. Co., 110 F.2d 485, at page 490, had this to say on the subject: "As was stated by the Supreme Court in Penn Mutual Life Ins. Co. v. Lederer, 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698, it is the essence of mutual insurance that the excess in the premium over the actual cost as ascertained shall be returned to the policyholders."

In Baltimore Equitable Society v. United States, supra (cited in footnote 2), the court, pointing out that the plaintiff insurance company had written term insurance at a fixed premium and that as to such insured "there was no mutuality", stated (3 F.Supp. at page 432): "* * * As we construe the statute, in order to be entitled to the exemption the plaintiff must show that the insurance business was conducted on a mutual basis. * * * We think that when Congress provided the exemption set out in the statute it intended that it should apply only to companies that are purely mutual * * *."

Parenthetically, it may be stated that in the instant case the plaintiff also issued term insurance.

In MacLaughlin v. Philadelphia Contributionship, etc., supra, 73 F.2d at page 584, the United States Circuit Court of Appeals for this Circuit stated: "Only a mutual company which uses or holds its income for the purpose of paying losses or expenses is exempt from taxation."

In Keystone Automobile Club Casualty Co. v. Commissioner, 122 F.2d 886, the United States Circuit Court of Appeals for this Circuit stressed the fact that the tax liability of an insurance company claiming to operate as a "mutual" company "turns upon the mutual or cooperative character of the petitioners." 122 F.2d at page 888. Said the court on page 890 of 122 F.2d: "A substantial departure from a fundamental requirement of a mutual company would preclude the court from giving the petitioners the freedom from taxation which they seek. Such a departure is present here."

In the Keystone case, the decision turned primarily upon the fact that policies were sold to outsiders who were not members of the company. The court, however, emphasized the fact that one of the fundamental characteristics of a tax exempt mutual insurance company is its organization and operation exclusively for the purpose of furnishing insurance at cost to its policy holders. Indeed, in footnote 6 (122 F.2d at page 890) the opinion cited McKean v. Biddle, 181 Pa. 361, 37 A. 528, which held: "The society was a mutual insurance company, of which those who were insured in it were the members, and as such entitled to take part in its government *and participate in any division of profits it might make.*" (Emphasis supplied.)

Significantly, the Keystone case pointed out that the Revenue Act alone is dis-

positive of the question of exemption. Said the court (122 F.2d at page 891): "The Act is clear that the provisions here involved are applicable only to mutual insurance companies. Regulations cannot amend the statute by granting an exemption or deduction for which the statute makes no provision."

To my mind this statement is dispositive of the plaintiff's contention here that under the Pennsylvania Act of 1921 it is treated as a mutual company. Assuming that the plaintiff correctly interprets the Pennsylvania Act, it is equally correct that a State law cannot alter the essential characteristics required to enable a so-called "mutual" insurance company to obtain exemption under the provisions of Section 101(11) of the Revenue Act.

▆ Under the Federal law, to be exempt, a mutual company must furnish insurance to its policy holders at approximate cost. If a particular insurance company—such as the plaintiff—operates under a State law which by its terms denies it the right to operate so as to furnish insurance to cash premium policy holders at cost, then such a company must accept the consequences which naturally follow from its own course of action in adopting a method of doing business of its own choosing. The Revenue Act does not extend an exemption to companies operating on a so-called mutual plan merely because their reserves eventually escheat to a particular State under the laws of that State.

▆ In my opinion, the change effective June 8, 1938, whereby the taxpayer adopted certain charter amendments under the Pennsylvania Act of 1921, did not have the effect of bringing it into the class of tax exempt mutual companies within the meaning of Section 101(11). The plaintiff did not operate as a purely mutual company within the meaning of the Revenue Act before the change in the charter, and its operations did not essentially change after the effective date of the charter amendments under the Pennsylvania Act. Incidentally, it may be stated that it appears that the principal reason for the change effected June 8, 1938, was to enable the plaintiff to issue "extended coverage" insurance and thereby obtain additional business in competition with the stock insurance companies. Other than this additional form of insurance which the taxpayer was authorized to issue under the 1938 charter change, its operations were substantially the same as prior thereto.

The Revenue Act of 1938 appears to provide for two types of mutual companies: (a) a wholly exempt mutual company which holds all of its income for the purpose of paying losses or expenses (covered by Section 101(11); and (b) mutual insurance companies which, while not exempt, retain a portion of the premiums received for the purpose of paying losses and expenses, and for the additional purpose of reinsurance reserves, and for the re-payment of a portion of the premium deposit to policy holders (covered by Section 207(a) (1) and (c) (3).

The record discloses that since its incorporation in 1843, the plaintiff's income has not been merely used for paying losses and expenses, but has in fact also been used to build up a large surplus for the purpose of expansion. It is indisputable that the company has not operated on the principle that insurance should be furnished to policy holders strictly at cost. It need only be pointed out that despite the fact that surplus resulted from operations over a long period of years, there has been no distribution to policy holders since 1873. Clearly, the surplus account (designated as a "Contingent Fund") was sufficiently substantial at all times over a long period to permit a distribution to policy holders had the plaintiff operated on the principle that insurance should be furnished at cost. The reserves maintained are patently far in excess of what would be required to meet probable losses.

The plaintiff's testimony indicated that the reserve required by the State of Pennsylvania during the year 1938 was $250,-000. In contrast, the "Contingent Fund" contained about $3,000,000 during the year 1938—approximately 60 times the actual premiums earned during that year. Had the plaintiff intended to operate as a purely mutual company, it would have made distribution to its policy holders over the course of years when its profits were so far in excess of the amounts required to build up necessary reserves.

▆ It is true that mutual companies have been the beneficiary of favorable tax legislation over a period of years. However, Congress has in the statutes and by the implied approval of the Commissioner's regulations, indicated a clear in-

tention to favor only mutual companies which, apart from charter powers, actually operate on the true mutual plan. Where the facts indicate that a company chartered as a mutual company has in actual operation over a period of years failed to meet the tests · of mutuality, the insurance companies have in recent years been taxed like other commercial corporations. The cases decided in this Circuit and previously referred to, as well as decisions in other Federal courts, have emphasized this legislative policy with respect to mutual insurance companies, and the tendency has been (and in my judgment properly so) to confine the exemption from tax to clear-cut cases where in actual operation the tests of a true mutual company have been fully met. Where, in fact, the company operates in a manner closely resembling the operations of an ordinary stock insurance company, there is no reasonable basis for granting an exemption from income tax. The burden rests on the taxpayer to prove its right to the exemption. In the instant case this burden has not, in my opinion, been met, and the taxpayer was therefore properly subjected to the imposition of income tax.

In a recent decision of the District Court for the Western District of Pennsylvania, in the case of Keystone Mutual Casualty Company v. Driscoll, 44 F.Supp. 658 (decided April 21, 1942, appeal now pending C.C.A. 3), Judge Gibson denied the claim for refund of Federal income tax where the taxpayer claimed it was a mutual insurance company within the meaning of the tax laws. Said Judge Gibson in that case (44 F.Supp. at page 659): "Those in charge of it desired to pile up a large reserve so that ultimately it might widen its territory and compete with other insurance companies. That idea was not bad in itself, but it is not the concept of the federal exemption statute. * * * It would * * * lead * * * not to the interest of present policyholders entitled to insurance at cost * * *."

The language of Judge Gibson in the Keystone Mutual Casualty Company case can well be applied to the factual situation in the instant case. , I might add that under the decisions a stricter rule has been applied with respect to the tests of mutuality in cases of mortgage guarantee companies, particularly where the major portion of the income arose from investments (see cases cited, footnote 1). A number of these cases were cited in defendant's brief in support of its position. I recognize, as counsel for the plaintiff pointed out, that the mere fact that a mutual company has a substantial amount of investment income, as distinguished from underwriting income, would not in itself deprive such an insurance company from an exemption from income tax under Section 101(11). It is, of course, true that investment income is incidental to the operation of a true mutual insurance company. However, a mutual company should, to entitle it to an exemption, regularly follow the policy of returning to the policy holders excess collections of premiums in order that insurance might be furnished at cost. Where it fails to do so, and the failure is chronic, it is clearly not operating as a purely mutual company within the spirit of the tax laws, and there is no sound reason why it should be entitled to more favorable treatment from a tax standpoint than a stock insurance company or any other corporation. I take it that this is the policy which Congress sought to declare in the taxing statutes, although it might well have been enunciated with greater clarity. The Commissioner's regulations have consistently indicated that this policy should be followed in the administration of the tax laws, and this interpretation of the Commissioner has received tacit approval in the fact that Congress has re-enacted these provisions of the law without substantial change.

Finally, as to the plaintiff's contention that if it is not totally exempt under the provisions of Section 101(11), it is entitled to a deduction of $51,101.39 for the year 1938 under Section 207(c) (3) of the Revenue Act, on the ground that this sum—representing premiums earned during the entire calendar year—was retained for the payment of losses and expenses and re-insurance reserves; and further that if it is not entitled to such a deduction for the full year of 1938, it is entitled to a deduction of $28,840.78 for the period from June 8 to December 31, 1938:

Section 207 provides as follows:

"§ 207. Mutual insurance companies other than life.

\* \* \* \* \*

"(c) Deductions. In addition to the deductions allowed to corporations by sec-

tion 23 the following deductions to insurance companies shall also be allowed, unless otherwise allowed—

\* \* \* \* \*

"(3) Mutual insurance companies other than life and marine. In the case of mutual insurance companies (including interinsurers and reciprocal underwriters, but not including mutual life or mutual marine insurance companies) requiring their members to make premium deposits to provide for losses and expenses, the amount of premium deposits returned to their policy holders and the amount of premium deposits retained for the payment of losses, expenses, and reinsurance reserves."

The Treasury Regulation promulgated in connection with Section 207 of the Act provides as follows: "Art. 207-6. Special deductions allowed mutual insurance companies (other than life or marine).— Mutual insurance companies (including interinsurers and reciprocal underwriters, but not including mutual life and mutual marine insurance companies), which require their members to make premium deposits to provide for losses and expenses, are allowed to deduct from gross income the aggregate amount of premium deposits returned to their policy holders or retained for the payment of losses, expenses, and re-insurance reserves. In determining the amount of premium deposits retained by a mutual fire or mutual casualty insurance company for the payment of losses, expenses, and re-insurance reserves, it will be presumed that losses and expenses have been paid out of earnings and profits other than premiums to the extent of such earnings and profits. If, however, any portion of such amount is applied during the taxable year to the payment of losses, expenses, or re-insurance reserves, for which a separate allowance is taken, then such portion is not deductible; and if any portion of such amount for which an allowance is taken is subsequently applied to the payment of expenses, losses, or re-insurance reserves, then such payment cannot be separately deducted. The amount of premium deposits retained for the payment of expenses and losses, and the amount of such expenses and losses, may not both be deducted. A company which invests part of the premium deposits so retained by it in interest-bearing securities may nevertheless deduct such part, but not the interest received on such securities. A mutual fire insurance company which has a guaranty capital is taxed like other mutual fire insurance companies. A stock fire insurance company, operated on the mutual plan to the extent of paying dividends to certain classes of policy holders, may make a return on the same basis as a mutual fire insurance company with respect to its business conducted on the mutual plan."

In reply to the plaintiff's contention that it is entitled to the benefits of Section 207 (c) (3), the defendant asserts that that Section is applicable only if the taxpayer can qualify as a mutual insurance company.

In my opinion, the plaintiff's contention that it is entitled to the benefits of Section 207 (c) (3) is without merit. The plaintiff claims this deduction despite the fact that it has already deducted, and the Commissioner has allowed, the full amount of expenses and losses attributable to its underwriting business during the year 1938 in the sum of $74,098.21. To permit a deduction of $51,101.39 for the full year 1938—or $28,840.78 for the period from June 8 to December 31, 1938—in the face of the allowance of $74,098.21, would be sanctioning a double deduction. Treasury Regulation 101, promulgated under the Revenue Act of 1938, specifically and properly covers this situation by prohibiting such a double deduction. This Treasury Regulation forbidding double deduction has continued in effect, despite later revisions of the 1938 Act, and under the well recognized rule the inference is that Congress approved of this Regulation.

I therefore conclude that, independent of the question as to whether the plaintiff is a mutual company and entitled to be taxed under Section 207(c) (3) of the Revenue Act, the taxpayer here is not entitled to deduct the sum of $51,101.39, representing the full amount of premiums earned during 1938, since it has already taken a deduction for losses and expenses in connection with its underwriting business during the year 1938. The same holds true as to the deduction claimed for the period from June 8 to December 31, 1938.

Section 207(c) (3) of the Revenue Act of 1938, and the Interpretive Regulations (Art. 207-6, Treasury Regulations 101), permit the deduction of excess premium deposits returned to policy holders by mu-

tual companies, and further permit the deduction of premium deposits retained for the payment of losses, expenses and re-insurance reserves. The Regulations, however, specifically provide that if any portion of the premium deposits is applied during the taxable year to the payment of losses, expenses, or re-insurance reserves for which a separate allowance is taken, then such portion is not deductible. In addition, the Regulations provide that if any portion of the premium deposits retained, for which allowance is taken, is subsequently applied to the payment of losses or expenses, then such payment cannot be deducted. Here the taxpayer's accountant, as already pointed out, admitted that the company in 1938 took deductions for losses and expenses as incurred to their full amount, and further that all of the disbursements pertaining to the underwriting income ($74,098.21) were thus taken as deductions in the company's return.

In consonance with my findings, both of fact and of law, I conclude that the Commissioner's determination of the tax in this case was proper, and judgment must be for the defendant.

Accordingly, I state the following

## Conclusions of Law

1. Plaintiff is entitled to be classed as an insurance company within the meaning of the Federal Internal Revenue laws.

2. The evidence fails to establish that plaintiff conducted its operations during 1938 as a pure mutual company within the meaning of Section 101(11) of the Revenue Act of 1938.

3. The change in the plaintiff's charter which became effective June 8, 1938, did not affect the proper classification of the plaintiff for income tax purposes, and such change was not sufficient to require the Commissioner to classify the plaintiff as a pure mutual company within the meaning of the tax laws after June 8, 1938, nor would such change in itself bring the plaintiff within the provisions of Section 207(c) of the 1938 act.

4. The plaintiff is not entitled to a deduction under Section 207(c) (3) for any part of the year 1938.

5. Under the evidence and the law, plaintiff has failed to sustain its burden of proof that the Commissioner erred to its detriment in the determination and assessment of the taxes, the recovery of which is sought herein.

6. The motion to dismiss, Action No. 1478, is hereby granted without prejudice in so far as the cause of action in No. 1478 is duplicated in Action No. 2503.

7. The objection of the defendant to the proposed supplemental stipulation of facts which was offered on behalf of the plaintiff, and which supplemental stipulation was neither signed nor agreed to, is sustained on the ground that the unsigned stipulation was not acceptable as evidence of the facts set forth therein.

8. The defendant is entitled to judgment for its costs.

An order may be submitted in accordance with the above.